Argued 1 February; decided 9 April; rehearing denied 15 August, 1900.

## LADD v. CHAMBER OF COMMERCE.

[60 Pac. 713, 61 Pac. 1127, 62 Pac. 208.]

PRINCIPAL AND SURETY—CONTRIBUTION BETWEEN COSURETIES.

1.  Where some of the sureties on a bond borrow money on their personal credit and use it to prevent a breach of the bond by the principal, other sureties who did not join in such proceeding cannot be compelled to contribute to the repayment of the money so borrowed.  Each surety is bound by the original contract, and is entitled to determine for himself the course to be pursued in case of a threatened breach of the bond.

CHANGING RELATION OF COSURETIES BETWEEN THEMSELVES.

2.  The fact that the owner of a building in course of erection who holds a bond executed by several persons to secure its erection and completion, gives to

37 OR.—4.

the sureties the charge of the construction and control of the funds provided therefor, does not change the relation of the sureties as between themselves so that a part of them can contract obligations binding on all.

RATIFICATION.

3. Before there can be a ratification there must have been something done on behalf of or in the name of the person ratifying.

CONTRIBUTION—PAYMENT BY COSURETY.

4. A surety cannot, except under peculiar circumstances, maintain a suit for contribution against a cosurety until he has paid the obligations to which the cosurety is asked to contribute.

SURETY—ENFORCEMENT OF CONTRIBUTION.

5. Though a surety may in some instances, without payment, compel a co-obligor to pay his portion of a common obligation (*Thompson* v. *Dekum*, 32 Or. 506, cited), yet that remedy is not available where the person to whom payment should be made is not a party to the suit, and the person seeking contribution has not paid more than his share of the obligation.

From Multnomah : JOHN B. CLELAND, Judge.

This is a suit brought by Charles E. Ladd, individually, and Caroline A. Ladd, William M. Ladd, Charles E. Ladd, and John Wesley Ladd, executrix and executors of the last will and testament of W. S. Ladd, deceased, against the Chamber of Commerce, a corporation, C. P. Bacon, Charles H. Dodd, T. M. Richardson, J. E. Haseltine, C. M. Idleman, Herbert Bradley, F. K. Arnold, R. L. Durham, J. L. Hartman, Samuel Heitshu, D. D. Oliphant, D. Solis Cohen, and Ellis G. Hughes. The prayer of the complaint is that the amount of the several obligations that have been assumed for and on behalf of the Chamber of Commerce by the plaintiff Charles E. Ladd and by W. S. Ladd, the testator of the other plaintiffs, and the defendants other than the Chamber of Commerce, under and by virtue of a certain bond to the New York Life Insurance Co., be ascertained and fixed; that the building of the Chamber of Commerce be sold, subject to the lien of a mortgage in favor of the New York Life Insurance Co., and the net proceeds thereof applied on the indebtedness referred to ; that the court ascertain and fix the due and equitable

proportion which should be contributed by each of the defendants, other than the Chamber of Commerce, toward the payment of the amounts advanced by the plaintiff Charles E. Ladd to pay and discharge certain obligations incurred by himself and the defendants, except Hughes, on behalf of the Chamber of Commerce, and the retirement of certain outstanding obligations to which the plaintiff Charles E. Ladd, and W. S. Ladd, deceased, are parties. The defendant Hughes, who alone answered, denies any liability on account of the matters or things set out in the complaint. The facts out of which the controversy between him and the plaintiffs arose are as follows : The Chamber of Commerce is a corporation, organized under the laws of the state. In 1890 it purchased lots 3, 4, 5 and 6, in block 46, in the City of Portland, and during that year determined to erect a building thereon, selected an architect, chose a design and awarded a contract for putting in the foundation of such building. The business of the corporation was conducted by and through a finance committee, which, in January, 1891, consisted of the appellant Hughes, the defendants Haseltine, Bradley, Durham, Oliphant, Arnold, Idleman, Cohen, Heitshu, Bacon, and Richardson, and W. S. Ladd, T. F. Osborn, E. Quackenbush, and George B. Markle. At that time the assets of the Chamber of Commerce, independent of its real estate, consisted of about $21,000 in cash, and its liabilities amounted to about $50,000. Negotiations with the New York Life Insurance Co. for a loan of money sufficient to complete the building resulted in a proposition from the insurance company to the committee to loan $450,000 at six per cent. for five years : $100,000 to be paid when the papers were signed, $140,000 when the building was erected and roofed and the cement floors put in, $70,000 when the white plaster was on, $40,000

when the standing trim was on, and $100,000 when the building was entirely completed; the corporation to pay all taxes and expenses, the salary of the inspector of the insurance company, not to exceed $3,000, and to furnish a bond guarantying the completion of the building within two years, and the creation of a sinking fund.

This proposition was accepted in April, 1891, and upon the suggestion of appellant Hughes, that, if the finance committee were to furnish the desired guaranty, the construction of the building should be left in its hands.    The Chamber of Commerce, on April 13, 1891, adopted the following resolution :

" Whereas, the arrangement made by the Chamber of Commerce of Portland, Oregon, with the New York Life Insurance Company, for the necessary funds to complete the Chamber of Commerce Building, requires a personal guaranty that the funds loaned the Chamber of Commerce shall be properly expended in the erection of the said building, and not otherwise ; and,

" Whereas, W. S. Ladd, G. B. Markle, Samuel Heitshu, Chas. H. Dodd, D. Solis Cohen, E. Quackenbush, F. K. Arnold, T. F. Osborn, C. M. Idleman, J. E. Haseltine, T. M. Richardson, Ellis G. Hughes, R. L. Durham, C. P. Bacon, and Herbert Bradley have agreed to furnish the New York Life Insurance Company the aforesaid guaranty on behalf of the Chamber of Commerce ; now, therefore, be it

" Resolved, that W. S. Ladd, G. B. Markle, Samuel Heitshu, Chas. H. Dodd, D. Solis Cohen, E. Quackenbush, F. K. Arnold, T. F. Osborn, C. M. Idleman, J. E. Haseltine, T. M. Richardson, Ellis G. Hughes, R. L. Durham, C. P. Bacon, and Herbert Bradley, or such of them as may sign the said guaranty, be placed in full control of all the funds derived from the New York Life Insurance Company, and of the construction and erection of the Chamber of Commerce Building until the completion thereof, with full power and authority to act in the premises, and to distribute the said funds for the

erection of said building ; that said power and authority shall be irrevocable, except for cause, shall be reduced to writing, and to that end the president and secretary are hereby authorized to execute the necessary papers on behalf of this chamber, and to attach the seal of this corporation thereto.''

On May 16, 1891, in pursuance of this resolution, and in order to effect the loan from the insurance company, the Chamber of Commerce, as principal, and the defendants Haseltine, Durham, Richardson, Cohen, Dodd, Idleman, Bradley, Arnold, Heitshu, and the appellant, Hughes, together with W. S. Ladd, T. F. Osborn, and George B. Markle, as sureties, executed and delivered to the New York Life Insurance Co. their penal bond in the sum of $900,000, as follows :

'' Know all men by these presents, that we, the Chamber of Commerce of the City of Portland, State of Oregon, a corporation, duly organized and existing under the laws of the State of Oregon, and having its principal office in the City of Portland, in said state, as principal, and W. S. Ladd, G. B. Markle, S. Heitshu, C. H. Dodd, D. Solis Cohen, C. M. Idleman, E. Quackenbush, F. K. Arnold, T. F. Osborn, J. E. Haseltine, T. M. Richardson, E. G. Hughes, C. P. Bacon, H. Bradley, and R. L. Durham, as sureties, are jointly and severally held and firmly bound unto the New York Life Insurance Co. in the sum of nine hundred thousand ($900,000.00) dollars, lawful money of the United State of America, to be paid to the said New York Life Insurance Company, its successors or assigns, in gold coin of the United States at its present standard of weight and fineness, for which payment, well and truly to be made, we do bind ourselves and our respective heirs, executors, administrators, successors, or assigns, jointly and severally, firmly by these presents. Sealed with our seals, and dated this 16th day of May, A. D. one thousand eight hundred and ninety-one.    The condition of the above obligation is such that :  (a) If the above-bounden Chamber of Commerce, its successors or

assigns, shall complete or cause to be completed its brick and stone building on Stark Street, between Third and Fourth Streets, in the City of Portland, Oregon, on lots three (3), four (4), five (5), and six (6), in block forty-six (46), of said city, to cover the full plat, 200x100 feet, in accordance with the plans, specifications, and designs heretofore submitted to the obligee, or as modified from time to time by consent of the said Chamber of Commerce and the said New York Life Insurance Co., within two years, strikes and other unavoidable casualties which cannot be met and overcome only excepted; (*b*) and shall pay or cause to be paid all liens, whether of mechanics, laborers, material men, or others, as well as all debts and obligations which are or may become a lien or charge upon said building or the land whereon the same is situate, before said obligee shall be called upon to make its final payment on the loan by it made to the said Chamber of Commerce in accordance with the terms, conditions, and ageeements of a certain mortgage from the Chamber of Commerce to the New York Life Insurance Co., the said obligee herein, bearing even date herewith; (*c*) and shall guaranty that the full amount, four hundred and eighty thousand dollars, which the said Chamber of Commerce has represented and does hereby represent, unto the said New York Life Insurance Company, that the construction of said building will cost, shall be expended on said building, together with such additional sums as may be required to properly finish and complete it in accordance with the plans, specifications, and designs of the architect, as heretofore submitted by said Chamber of Commerce to said New York Life Insurance Company; (*d*) and in case any liens of any nature shall be filed against said property during the construction of said building, or after its completion, upon notice thereof, and the request by the attorney of the said New York Life Insurance Company, the parties signing this bond as sureties shall deposit with the County Clerk of Multnomah County, Oregon, the amount of such lien or liens, and accrued costs thereon, within ten days from the date of such notice, and demand upon them, which amount so deposited shall be applicable to the satisfaction of such

lien or liens and costs and charges,—then the above obligation to be void ; otherwise, to remain in full force and virtue.   In witness whereof, the said Chamber of Commerce, principal, has caused its corporate name to be subscribed by its proper officers thereunto duly authorized, and its corporate seal to be hereto affixed, and the said parties described as sureties have set their hands and seals the day and year hereinbefore written.''

On June 12, 1891, the first payment, of $100,000, was received from the insurance company.   In July, the sureties on the bond, acting as the finance committee and agents of the Chamber of Commerce, awarded contracts for the construction of the building, amounting to about $475,000, and proceeded with the work.   The appellant, Hughes, participated in the deliberations and acts of the committee until November, 1891, when he went to Europe, and did not return to Oregon until September 1, 1894, after the building was entirely completed and accepted.   He remained a member of the finance committee, however, except for a short time in the early part of 1894. During his absence the other members of the committee, consisting of his cosureties on the bond and one or two other persons, in order to put the building in condition to entitle the Chamber of Commerce to the second installment due on the loan from the insurance company, borrowed the sum of $90,000, and gave their individual, joint and several promissory notes, respectively, to the London & San Francisco Bank for $60,000 and the Bank of British Columbia for $30,000 therefor.   They then proceeded with the construction of the building until January, 1893, when W. S. Ladd died, and the plaintiff Charles E. Ladd was elected to the vacancy on the committee caused thereby.   Thereafter the members of the committee again borrowed on their individual, joint and several promissory notes, of the London & San Francisco Bank, an additional

$60,000, and of Donald Macleay $10,000, for use in the construction of the building, payment of interest, taxes, and other expenses incident to the work; and, in order to pay off the contractors and material men, and thus clear the building so as to entitle the Chamber of Commerce to the last installment from the insurance company, they executed and delivered to such contractors and material men their individual, joint and several promissory notes, amounting to about $60,000. All the money borrowed was paid over to the treasurer of the Chamber of Commerce, and disbursed upon warrants, the same as other funds of the corporation, and the members of the finance committee were credited therewith. None of these notes were signed by the appellant, Hughes, nor were they given at his instance or request, or with his knowledge.

On April 17, 1893, however, Mr. Arnold, a member of the finance committee, and a cosurety with the appellant, advised him by letter that "the building is approaching completion, and we hope to have it ready for occupancy in about sixty days. We are going to be from $175,000 to $200,000 short in funds when the building is finished. The financial committee have carried about this amount as a loan for the last year, and Markle's idea now is that we can place that in the form of a second mortgage, to be guaranteed by the finance committee personally. At the end of three years from now, when the New York Life mortgage matures, we shall have paid upon that at least $100,000, and then we can make a new mortgage consolidating the two, and thus relieve ourselves of the responsibility." On September 13, 1893, after the building had been completed and accepted, Mr. Arnold again wrote him concerning the matter, saying: "The financial part of the business is not so satisfactory as we might wish. After getting all our money from the New York Life, we find ourselves short about $190,000,

for which the finance committee have signed and are to sign notes.   The building has cost us something like $70,-000 or $80,000 more than the estimate, and you will remember that in figuring out our assets, and what we had to pay with, we have always counted upon placing the $100,000 of unsubscribed stock.   Of course, at the present time, it is out of the question to sell this for anything, and all we can do is to carry the indebtedness the best we can until times improve so that we can sell the stock or float a second mortgage indorsed by a committee.   This indebtedness is now distributed about as follows :  To the London and San Francisco Bank, $90,000 ;  to the Bank of British Columbia, $30,000 ;  to Donald Macleay, $10,-000 ;  to Kenneth Macleay, $5,000 ;  to Arthur Johnson & Brother and sundry subcontractors' notes, at three and four months, in small sums, aggregating $60,000. *   *   *   Several of the finance committee have alluded to the fact that you are away, and have not signed any of these obligations.   I have taken the liberty of referring them to your letter which you sent me soon after you went abroad, and in which you tendered your resignation as a member of the committee, or, if we decided not to accept your resignition, to remain as a member, and assume your share of whatever responsibility the other members of the committee might be called upon to assume.   I hope I have not exceeded your intention in this statement, as I merely gave my understanding of your letter.   The alternative of not signing the short-time notes which have been given the contractors in settlement was to have the building covered with liens amounting to about $161,000, which amount, under the terms of our contract with the New York Life, we should have been obliged to pay in court within ten days from the filing of the liens, and, while no one likes to sign $60,000 notes maturing in three

or four months, yet we preferred to do this, hoping things would brighten up at that time, rather than take the other horn of the dilemma.''

In answer to this last letter, Mr. Hughes, on December 30, 1893, wrote to the finance committee as follows : ''Having remained a member of your body during my absence from the City of Portland from November, 1891, to the present time, and having, by reason of such absence, failed to execute such contracts and obligations as it has been found necessary for you to execute and assume individually, and, as a committee, in carrying on the work of erecting and completing the Chamber of Commerce Building, I hereby obligate myself that, being allowed to remain a member of your body, I will, immediately on my return home in the spring or summer of 1894, bind myself on all contracts and obligations executed by you all in your individual capacity, or individually as a committee, and connected with said Chamber of Commerce Building, or in any wise appertaining to its construction or erection, and then outstanding, by signing such contract or obligation as a party to and co-obligor therein ; and that I will, as soon after my return as at all practicable, pay my proportionate share of any and all amounts which may have been paid by you, and each and every one of you, either acting as a body or each for himself in that behalf, which have been paid from your own private funds or resources on account of any contract or obligation made or assumed on account of or in connection with the building and operation of said Chamber of Commerce Building, and not then reimbursed ; nevertheless, conditioned on my receiving on account thereof my proportionate interest, and the same interest as each and every one of you, on and in any and all claim or claims held by you against said Chamber of Commerce Building of said Chamber of Commerce of the City of

Portland by reason of the payment or payments made by you as aforesaid.'' In January, 1894, Mr. Honeyman was elected a member of the finance committee in place of Mr. Hughes, but on March 6, Mr. Hughes' letter being presented and read, he was thereupon elected a member to fill a vacancy caused by the resignation of T. F. Osborn, and has since continued to act as a member of the committee, and to participate in its deliberations. In March, 1895, the Chamber of Commerce being without funds, and it being necessary to raise money with which to pay interest, taxes, and other expenses, the members of the finance committee borrowed of John Green $20,000, and in January, 1897, of one Annie Breck $5,500, giving their individual, joint and several promissory notes, each of which was signed by the appellant, Hughes, with the other members of the committee. The notes given for the amounts due the contractors and material men were taken up and paid by Charles E. Ladd, one of the makers thereof, prior to the commencement of this suit. The other notes were still outstanding and unpaid, but those signed by W. S. Ladd had been presented and allowed as claims against his estate. The cause was tried practically upon a stipulation of facts, from which it appears that all the defendants except Bacon, Richardson, Haseltine, and Hughes are insolvent. The court below held Hughes was, in equity, liable with his cosureties on the bond to the insurance company for the amount of money borrowed by them to complete the Chamber of Commerce Building, and entered a decree apportioning the amount between him and the other solvent sureties, from which he appeals.                                    Reversed.

For appellant there was a brief over the names of *Ellis G. Hughes*, *in pro. per.*, and *R. & E. B. Williams*, with an oral argument by *Messrs. Hughes* and *Richard Williams.*

For respondents there was a brief over the name of *Williams, Wood & Linthicum*, with an oral argument by *Messrs. George H. Williams* and *Stewart B. Linthicum*.

MR. JUSTICE BEAN, after making the foregoing statement of facts, delivered the opinion.

Although the record and briefs are voluminous, and the argument of counsel has taken a wide range, the real merits of the controversy lie within a narrow compass. The plaintiff's claim against Hughes is predicated upon the bond to the New York Life Insurance Co., which he, W. S. Ladd and others executed as sureties for the Chamber of Commerce on May 16, 1891. The contention is that the sureties on such bond, in effect, undertook and agreed that they would, if their principal did not, complete, or cause to be completed, within two years, a stone building for its use and benefit, to cost not less than $480,000, according to certain plans and specifications, and, therefore, to use the language of counsel, they were "bound to procure, and, if necessary, to borrow, the money to complete this building within the time specified; and, if a part of the sureties paid out money in the performance of this obligation, the other sureties are liable for contribution." In short, the position of the plaintiffs is that by signing the bond the sureties entered into an independent obligation upon their part to procure and furnish the necessary funds to erect and complete the building within two years from the date thereof. But we do not so understand the contract of the sureties. The obligation is an ordinary penal bond, with the Chamber of Commerce as principal and certain persons as sureties, to be void in case the obligor and principal thereof shall erect and construct a certain building on property belonging to it, at a cost of not less than $480,000, within a certain time,

and pay all liens or claims which might become liens thereon. The only independent covenant on the part of the sureties is that, in case liens of any nature shall be filed against the property during the construction of the building, or after its completion, "upon notice thereof, and the request by the attorney of the said New York Life Insurance Co.," they will "deposit with the County Clerk of Multnomah County, Oregon, the amount of such lien or liens and accrued costs thereon, within ten days from the date of such notice and demand upon them." It is not pretended that there was any breach of this stipulation, and it need not be further considered in the case.

1. As to the other conditions of the bond, the agreement of the sureties is, in legal effect, to pay to the insurance company such damages as it might sustain in case of a breach thereof by their principal. They did not obligate themselves to perform such conditions. That was the contract and duty of the principal alone, and the sureties were only liable to the obligee in case it failed to perform them. Nor did they undertake or agree to erect the building, or to pay the contractors or material men, but only to answer to the insurance company for such damages as it might sustain if the Chamber of Commerce failed to do so. Their liability was to the insurance company alone, and there is neither allegation nor proof that it ever made or had any claim for damages under the bond. But it is argued a breach of the bond and consequent damages to the insurance company would have occurred if certain of the sureties had not pledged their individual credit for money with which to complete the building. This may be true, although it does not appear, except inferentially, that the Chamber of Commerce could not have provided sufficient funds for that purpose on its own credit if it had been requested to do so. The

finance committee, composed principally of sureties on the bond, seems to have voluntarily borrowed the money, and paid the obligations of the Chamber of Commerce upon their own responsibility, and without consulting their principal. But, assuming that, if they had not done so, there would have been a breach of the bond, it does not follow that the action of a part of the sureties in borrowing money for the Chamber of Commerce to use in the construction of the building would bind a nonparticipating surety. The borrowing sureties could determine for themselves the necessity or desirability of doing so, but they had no authority to determine that question for Hughes, and bind him by their acts. There was no agreement between the sureties by or under which such authority was granted, nor anything in the bond authorizing one surety to act in this regard for another, or the majority for all. Each surety had a right to stand upon the letter of his contract, and, in case of a breach or threatened breach of the bond, to exercise his own judgment as to whether it was better for him to suffer default and answer in damages to the obligee in the bond, or to become liable on a new obligation. His cosureties could not determine that question for him. They were not his agents in any sense of the word. By signing the bond, he became liable, as before stated, to the New York Life Insurance Co. in case of a breach thereof, and not to his cosureties, except under the doctrine of contribution. Neither the obligee nor the obligor in the bond could vary or enlarge the liability of a surety; and there is certainly nothing in the relation of cosureties, one to the other, which to any extent, or on any ground, authorizes one to act for or bind the other.

Where one surety is compelled, by the maturity of an obligation and the failure of the principal to perform, to pay or discharge a common debt he has a right of con-

tribution from his cosurety; but this right rests on prin-
ciples of natural justice, and not contract : *Durbin* v.
*Kuney*, 19 Or. 71 (23 Pac. 661); *Thompson* v. *Dekum*, 32
Or. 506, 513 (52 Pac. 517, 755).   There is no contractual
relation between sureties enabling one to discharge a com-
mon obligation at his own pleasure and in his own way,
and thereby bind the other.   The whole right of contri-
bution rests upon the doctrine of compulsory payment.
Where one surety is compelled to pay, the nonpaying
surety is required to contribute in proportion to the bene-
fit received by him.   But this obligation is raised by the
necessity which the paying surety was under of making
the payment, and therefore he can have no contribution
unless his payment was compulsory : *Halsey* v. *Murray*,
112 Ala. 185 (20 South. 575); *Bancroft* v. *Abbott*, 3 Allen,
524 ; *Skrainka* v. *Rohan*, 18 Mo. App. 340 ; *Hollinsbee* v.
*Ritchey*, 49 Ind. 261.   In making the payment, or other-
wise assuming to discharge the common obligation, a
surety acts for himself alone, and at his own risk.   If
his payments are made under certain circumstances and
conditions, a court of equity will require his cosurety to
contribute his proportionate share of the amount of such
payment.   But, before the right of contribution arises,
the cosureties are mere strangers, one to the other, and
one has no right or authority to make contracts for an-
other.   Now, in this case, there was no breach of the
bond, and no claim for damages thereunder was ever
made by the insurance company.   Had a claim matured
on the bond in favor of the insurance company, and been
paid by part of the sureties, they might, perhaps, compel
contribution from the nonpaying sureties without the
recovery of a judgment for breach of the bond, by mak-
ing it appear that they had no means of preventing a
judgment against them.   But they could not voluntarily

borrow money for their principal, and bind a nonpartici-
pating surety.

2.    It is claimed, however, that the resolution of April
13 in some way changed or modified the rules ordinarily
applicable to the relation of cosureties, and, in effect,
made the sureties on the bond joint contractors or prin-
cipals.    But the object of this resolution is apparent.    It
was to place the signers of the bond in full control of all
funds derived from the insurance company, and of the
construction and erection of the building, so that they
might protect themselves, as sureties on the bond, against
liability for the acts of other persons. ' It did not in any
way change their relation to the insurance company, or
to one another as sureties.    It only defined their rights
and powers while acting as agents of the Chamber of
Commerce.    Their liability to the insurance company was
fixed by the terms of the bond which they signed, and, as
between themselves, by the law of suretyship.    By the
resolution they became agents of the Chamber of Com-
merce for the construction and erection of the building,
and not of one another as sureties on the bond.    Nor were
they bound by such resolution, or the terms of the bond,
to advance money for, or loan their individual credit to,
the Chamber of Commerce, to enable it to perform its
contract with the insurance company.    It was not their
duty, even under the resolution, to pay the material men
and contractors for the building, or to provide funds for
that purpose, but only to disburse and distribute the
money received from the New York Life Insurance Co.,
and such other funds as their principal, the Chamber of
Commerce, might provide for the erection of the build-
ing.    Upon the fulfillment of the terms and conditions
of the bond, their liabilities as sureties ceased ; and as
the appellant Hughes is not a party to any of the notes
in controversy, except those to Green and Breck, and his

cosureties had no authority to bind him by the execution thereof, it seems necessarily to follow that he is not liable to contribute to the payment of such notes.

3.    It is claimed that Hughes, by his letter of December 30, 1893, to the finance committee, ratified and confirmed the acts of his co-obligors on the bond to the insurance company in the construction of the building and borrowing money for that purpose.   But, as they did not assume to act for him, or to bind him in any way, there was no contract or pretended contract on his part which he could ratify.    The letter is an offer to bind himself on all contracts and obligations theretofore executed by the committee, and connected with the erection of the Chamber of Commerce Building, ''by signing such contract or obligation as a party to and co-obligor therein,'' when he should return ''in the spring or summer of 1894,'' upon certain conditions, which do not seem to have been fulfilled.

4.    The letter can have no effect in determining his liability under the bond to the New York Life Insurance Co., and hence, as stated by counsel for plaintiffs, the real and only question in the case is, ''Have the plaintiffs a right to claim contribution from the defendant as one of the signers of the bond to the New York Life Insurance Co. for moneys borrowed and used in the construction of the Chamber of Commerce Building?''   And this question must, in our opinion, be answered in the negative. It is admitted that Mr. Hughes signed the Green and Breck notes.   He claims, however, that he is a mere surety for the plaintiff Charles E. Ladd and the other makers.   But, however this may be, this suit cannot be maintained, because the notes have not been paid by the plaintiff, and are now owned by one F. B. Pratt, who is not a party.   It is elementary law that, except under

37 OR.—5.

peculiar circumstances, a suit for contribution cannot be maintained by one of several joint obligors until payment of the joint obligation has been made, or something done equivalent thereto :    *Backus* v. *Coyne*, 45 Mich. 584 (8 N. W. 694) ;   *Shoemake* v. *Stimson*, 16 Wash. 1 (47 Pac. 218); *Weidemeyer* v. *Landon*, 66 Mo. App. 520 ;   *Huse* v. *Ames*, 104 Mo. 91 (15 S. W. 965).   It follows that there is no ground for the interposition of a court of equity at the suit of the plaintiffs, so far as the Green and Breck notes are concerned.   The decree of the court below must, therefore, be reversed, and the complaint, as to the appellant, Hughes, dismissed, and it is so ordered.

REVERSED.

Decided 15 August, 1900.

ON PETITION FOR REHEARING.

PER CURIAM.   5. The able and forcible petition for rehearing, as well as the importance of the case, has impelled us to re-examine the questions involved with the utmost care, notwithstanding which we are constrained to adhere to the former opinion.   A surety may, in some instances, in a proper proceeding, without payment, compel his principal to pay, and the creditor to receive, the debt for which he has made himself liable :   7 Am. & Eng. Enc. Law (2 ed.), 345.   But such remedy is not available here.   The Chamber of Commerce is not a party to, nor is it liable to pay, the Green note ; and, moreover, neither the owner nor holder of that or the Breck note is a party to the suit.   So, also, one joint obligor may, under special circumstances,—as where the debt has been reduced to judgment, and the liability of the judgment debtors as between themselves is unascertained and undetermined, as in *Thompson* v. *Dekum*, 32 Or. 506 (52 Pac. 517, 755),—without having actually paid the debt, proceed in equity to ascertain the rights

of the parties, and compel a co-obligor to pay his portion of the common obligation.   But this case presents no special features to take it out of the general rule. . Indeed, on the whole, it is difficult to conceive what decree the court could make if it should entertain jurisdiction and find the defendant Hughes liable on the Green and Breck notes.` It could not require the owner and holder of the notes to accept payment, because he is not a party to the suit; and, if he were, the court could not compel him to accept partial payment, or prevent him from enforcing collection from any of the joint makers, if he so chose; nor could we order Hughes to pay his portion of the debt to the plaintiff, for the plaintiff could not give him a discharge, nor has he yet paid more than his proportion of the obligation.   So we are of the opinion that, on the record, the court ought not to entertain jurisdiction so far as the Green and Breck notes are concerned.   The other matters are sufficiently considered in the former opinion.   There is no difference in principle, so far as we can see, between Hughes' liability on the notes given directly to the contractors and those given for money borrowed to aid in the construction of the building.   In either case his liability depends upon the interpretation of the bond given by the Chamber of Commerce to the New York Life Insurance Co., and we have sufficiently indicated our views upon that question.   The petition for rehearing is therefore denied.                        REHEARING DENIED.

Decided 17 September, 1900.

ON MOTION TO RECALL MANDATE.

PER CURIAM.   The motion to recall the mandate is overruled.   The statement in the opinion on the petition for rehearing that "the Chamber of Commerce is not a party to, nor is it liable to pay, the Green note," was in-

tended to refer to its liability upon the face of the note, and not to the rights, equitable or otherwise, of the makers thereof against it for indemnity or reimbursement.     In *Wolmershausen* v. *Gullick*, 62 Law J. Ch. 773, unlike the case at bar, the principal creditor was proceeding against the plaintiff alone for the full amount of the debt, and had established his claim by judgment, or what was deemed equivalent thereto. But, whether such fact is material or not, we are unwilling to follow the doctrine of that case.     The conclusion therein that the surety against whom the claim was established could, before actual payment, maintain a suit in equity against a cosurety, and obtain a prospective order directing the defendant, upon payment by the plaintiff of his own share, to indemnify him against further liability, is reached, as stated by the court, in the "absence of express authority," and is contrary to American adjudications, as we understand them.          MOTION OVERRULED.